DECISION
This matter is before the Court pursuant to the parties' cross-motions for summary judgment filed in response to the plaintiffs' initial petition for declaratory judgment.[1]
Plaintiffs Carmel Absi, Richard W. Frank, Carol McCloskey, Joseph Moreno, and Timothy M. Servant, who are all dentists and dental hygienists working for the Rhode Island Department of Corrections, ask this Court to declare that they are classified employees within the Merit System Act, R.I. Gen. Laws §§36-3-1 et seq., and 36-4-1 et seq., and that they are thereby entitled to all benefits currently afforded state personnel within the state service, retroactive to the date of their initial hiring. Defendants Rhode Island Department of Administration, Anthony Bucci, in his capacity as Personnel Administrator, Rhode Island Department of Corrections, and George Vose, in his capacity as Director of Corrections (hereinafter referred to collectively as "the State") claim that sovereign immunity protects them from the declaratory judgment requested by plaintiffs, and alternatively, that plaintiffs are contract employees, legally hired outside of the state Merit System Act, pursuant to the State Purchases Act, R.I. Gen. Laws § 37-2-72.
For the reasons set forth in this Decision, this Court declares that plaintiffs are not state employees and have never been state employees within the Merit System Act. This Court further declares that plaintiffs were lawfully hired as contract employees, consistent with the State Purchases Act, R.I. Gen. Laws § 37-2-1 et seq., as amended by R.I. Gen. Laws §37-2-72 et seq., and are entitled only to the benefits of their contracts.
 Facts/Procedural History
The plaintiffs, who are dentists and dental hygienists, have provided dental services to inmates at the Rhode Island Department of Corrections for approximately five to ten years, contingent on their initial dates of employment.[2] One of the dentists, Dr. McCloskey, was originally designated as an independent contractor for the Department of Corrections in June of 1989. This categorization changed in 1991, both for her as well as many other independent contractors employed by the State, when all State consulting contracts were audited by the IRS due to alleged abuses by the State in classifying persons employed as independent contractors. This audit resulted in the cancellation of contract payments to certain workers "who were procured by means of a purchase order."[3] The audit also necessitated a reclassification from all contract payments made to state employees to salaries or wages and called for additional policies and procedures relating to the hiring of independent contractors by the Department of Administration.[4]
To comply with proper tax deductions and withholdings, the Office of Personnel Administration made an emergency filing on October 30, 1991 to amend the State Personnel Rules and Regulations to "set polic[ies] for employee[s] who work under special contract." This emergency filing identified previously labeled independent contractors as "special contract employees." Under this new classification, promulgated in section 4.0226.1 of the State Personnel Rules and Regulations, a "special contract employee" was defined as a "limited, unclassified appointment as authorized by [R.I. Gen. Laws §] 36-4-2 (15) . . . which is distinguishable from traditional classified or unclassified employment in that these employees are not entitled to civil service protection."[5] Further, persons in these positions are exempt from receiving state employment benefits, including all health insurance, life insurance, retirement contributions, and employment leaves. Additionally, section 4.0226.1 established that the "special contract employee" position "shall be established for six months or its equivalent, not to exceed 1040 hours." This emergency policy expired after 120 days, on February 27, 1992, and was never permanently enacted to formally amend the regulations as would have been required by R.I. Gen. Laws §§42-35-3 (a) and 42-35-3 (b).
After the expiration of the emergency classification, the Director of the Department of Corrections, George Vose, Jr. ("Vose"), requested advice from the Director of the Department of Administration, Harry Baird. Director Vose inquired whether this "special contract employee" category would continue into fiscal year 1993 and whether any procedural changes in the regulations governing hiring would be promulgated as a result thereof.
The Associate Director of the Department of Administration/Human Resources, Robert Tetreault ("Tetreault"), apparently forwarded this request to the Associate Personnel Administrator, Pasquale Marsella, Jr. ("Marsella"). In correspondence between Marsella and Tetreault dated April 17, 1992, Marsella claimed that the "special contract employee" designation "was not created to respond to situations where there would be a continued uninterrupted employment process . . . [i]n fact, the [s]pecial [c]ontract [e]mployee process was designed to restrict the time period of services to not exceed six months or 1,040 hours." Marsella further opined, however, that "[i]f there are reasons that recruitment for positions in this area of service is not successful, then a review should be conducted to arrive at a viable solution to the situation."
 The Contracts
From June 1, 1989 to January 15, 1992, Dr. McCloskey was an independent contractor employed by the State for the Department of Corrections. Her services were initially engaged through the Office of Purchases at the Department of Administration as evidenced by the copies of purchase order vouchers and monthly invoice vouchers detailing payments made to Dr. McCloskey for her services from June 1989 to December 1990 and proffered by plaintiffs per the Court's request. The plaintiffs also submit the 1990 contract between the State of Rhode Island, Department of Corrections and Dr. McCloskey. (Plaintiff's Exhibit 17). This agreement covered the term from July 1, 1990 to June 30, 1991. The contract provided that "either party may terminate this Agreement upon a 45-day written notice to the other." According to the contract, the "scope of services" required by Dr. McCloskey included:
 "[P]ersonal on-site dental services for the diagnosis and treatment of inmates' dental needs for a total of thirty-five (35) hours per week. On-site services will begin at 8:00 a.m. and end at 3:00 p.m. Said services will be provided under the supervision of the Chief of Dentistry. Dr. McCloskey is entitled to three (3) days administrative (educational) leave, in order to maintain her license."
The method of paying Dr. McCloskey for her services according to the terms of the 1990 contract were as follows:
 "[Department of Corrections] agrees to compensate Provider in the amount of forty dollars ($40.00) per hour. Provider will be paid on a monthly basis following the submission of an invoice showing the exact hours and location(s) such services were provided during the period claimed. Total payment for these services will not exceed sixty-five thousand, eight hundred dollars ($65,800.00) — $40.00 x 35 hrs./wk. x 47 wks."
On January 15, 1992, Dr. McCloskey signed an employment agreement as a contract employee for the term of July 1, 1991 to June 30, 1992. Thereafter, her employment and the subsequent employment of each dentist and hygienist at the Department of Corrections was renewed by a series of similar one-year contractual agreements.
All of these contractual agreements followed the same model initially established by the preliminary agreements between Dr. McCloskey and the State of Rhode Island, Department of Corrections. The most recent contracts covering the term from July 1, 1999 to June 30, 2000 also require each dentist and hygienist to work approximately 35 hours per week, from 8:00 a.m. to 3:00 p.m., at the Adult Correctional Institutions, under the supervision of the Chief of Dental Services. Unlike the preliminary contracts, and prior to the "special contract employee" designation, each dentist or hygienist is required to attend monthly staff meetings on the first Tuesday of each month. Additionally, either party to the agreement has the option to terminate the agreement, in writing, within (5) calendar days (as opposed to the initial 45 days). The State also retains all documents and reports produced by the dentist or hygienist. The contracts further prohibit any alteration, amendment, or other modification to the agreement, except by a writing duly executed by both parties to the contract.
Under these contracts, the State agreed to compensate each dentist or hygienist for his or her services and to pay for their share of social security taxes (FICA). The dentists and hygienists are paid every four weeks on a "special payroll" from which gross amounts of federal and state income taxes and FICA are withheld. Under the 1999 fiscal year contracts, the dentists received a gross wage of $70,735.00, at an hourly rate of $43.00.[6] The hygienists in fiscal year 1999 were paid gross wages of $50,760.00, at an hourly rate $27.00.[7] The State also stipulated in each contract that its obligations ceased immediately if in any fiscal year the Legislature or federal funding sources failed to appropriate sufficient funds for the contract. Finally, the parties agreed that the law of Rhode Island governed all matters pertaining to the construction, validity, and performance of the contract.
None of the contracts oblige the State to provide the plaintiffs with health insurance, life insurance, membership in the state retirement system, vacation pay, holiday pay, sick leave, and longevity. While the contracts do not explicitly express that plaintiffs are not state employees under the Merit System Act, its terms are inconsistent with such a posture. To supplement the language of the contracts and to buttress their argument that they are state employees within the state service, plaintiffs have submitted sworn affidavits indicating that the Department of Corrections determines their hours of work and the entire scope of services that they provide in the course of their employment. The plaintiffs also maintain in their affidavits that the Department of Corrections sets treatment guidelines to handle the inmate population and determines which inmates will receive such treatment. The plaintiffs also aver in their affidavits that their lunch and other breaks are determined by the Department of Corrections and that the Department provides all dental equipment and instruments utilized in servicing the inmate patients.[8]
 The Petition
On November 4, 1997, plaintiffs filed a petition with the Personnel Administrator for the Department of Administration, Anthony Bucci ("Bucci"), seeking to be designated as classified employees within the state classified service, pursuant to R.I. Gen. Laws § 36-4-2, and to receive all other benefits and protections of employment under State law and/or the State Personnel Rules and Regulations. Their demands include: (1) health insurance, (2) life insurance, (3) membership in the state retirement system, (4) vacation pay, (5) holiday pay, (6) sick leave, and (7) longevity. Plaintiffs sought reimbursement and/or credit for the benefits alleged to have been improperly denied, retroactive to the date of their initial appointment with the Department of Corrections. Plaintiffs also demanded that the State pay them longevity pay earned as of their initial dates of employment with the Department of Corrections and attorneys' fees for the instant litigation. Plaintiffs also stated that they would like to continue in their positions once properly classified. Ironically, plaintiffs did not seek to have their current or past compensation modified to reflect the current pay rate paid at such a grade in the state Merit System.
Bucci denied this petition on August 4, 1998. He relied on a provision of the State Purchases Act, R.I. Gen. Laws §37-2-72, which provides the State with the authority to procure professional medical and dental services by contract.
On August 14, 1998, the plaintiffs appealed Bucci's decision to Sandra Crowe, ("Crowe"), the Administrator of Adjudication of the Department of Administration. Crowe would not hear the appeal, claiming a lack of jurisdiction, pursuant to R.I. Gen. Laws § 36-4-40. That statute only allows the Administrator of Adjudication to hear an appeal from "any person with provisional, probationary, or permanent status." Crowe asserted that the plaintiffs "are not currently classified employees" and therefore fall outside the purview of her authority.
On September 18, 1998, the plaintiffs filed a petition in this Court for a declaratory judgment, requesting the Court to declare that they are classified state employees pursuant to the Merit System Act, R.I. Gen. Laws § 36-4-1, and eligible to receive other benefits and protections of employment under State law. The plaintiffs' four count complaint alleges:
 I. Improper denial of membership in the state classified service since the date of initial employment with the Department of Corrections;
 II. Improper denial of all insurance benefits since the date of initial employment with the Department of Corrections, including hospital care, surgical medical service benefits, group life, accidental death, long term health care, and other insurance benefits as authorized by R.I. Gen. Laws §§ 36-12-6, 36-12-14;
 III. Improper denial of participation in the state retirement system since the initial date of their employment with the Department of Corrections, pursuant to R.I. Gen. Laws § 36-10-1 et seq; and
 IV. Improper denial of sick leave, longevity, vacation and other benefits as provided in the Personnel Rules and Regulations published by the Office of Personnel Administration.
On October 30, 1998, the State filed a motion to dismiss plaintiffs' complaint pursuant to Rule 12 (b)(6). The State argued that it never waived its sovereign immunity and thus is protected from any declaratory judgment against it, pursuant to the Rhode Island Supreme Court's decision in Rhode Island Bridgeand Turnpike Authority v. Nugent, 95 R.I. 19, 182 A.2d 427
(1962). Plaintiffs objected to this motion.
Pursuant to an agreement between the parties on April 6, 1999, Justice Thompson ordered that this matter be resolved by cross-motions for summary judgment. The parties filed cross-motions for summary judgment, together with extensive exhibits and legal memoranda. This Court heard arguments on these cross-motions for summary judgment on October 6, 1999, after which the parties filed additional supplemental memoranda.
 Summary Judgment
To be awarded summary judgment, a moving party must demonstrate by affidavits, depositions, pleadings, and other documentary matter that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. RIH Medical Foundation, Inc. v. Nolan, 723 A.2d 1123, 1125 (R.I. 1999). As both parties filed motions for summary judgment, and essentially agree that this case presents legal issues for the Court to decide, the Court will proceed to decide this declaratory judgment action as a matter of law.
 Sovereign Immunity
Before this Court addresses the merits of this declaratory judgment action, it must first determine, as a threshold matter, whether the State is protected from a declaratory judgment action under the doctrine of sovereign immunity. The State premises its sovereign immunity defense on the Rhode Island Supreme Court's decision in Rhode Island Bridge and Turnpike Authority v. Nugent,95 R.I. 19, 182 A.2d 427 (1962). That case established sovereign immunity protection for state agencies in actions filed against them by other state agencies pursuant to the Uniform Declaratory Judgments Act, R.I. Gen. Laws § 9-30-1 et seq. In Nugent, the Court ruled that the Mount Hope Bridge Authority was a state agency and therefore possessed sovereign immunity from suit against it by the Uniform Declaratory Judgments Act. The underlying rationale for the Court's decision to grant such immunity in Nugent, however, was to protect one state agency from suit by another state agency in a declaratory judgment action.Nugent, 95 R.I. at 29, 182 A.2d at 432. The Nugent case is distinguishable, therefore, from the instant matter which involves a declaratory judgment action filed by private individuals to clarify their employment status with the State — an issue, frankly, which is in the interest of all parties to this case to have resolved.
Moreover, there is ample precedent, while not expressly addressing Nugent, that recognizes the appropriateness of declaratory relief as against the State, particularly if it pertains to resolving issues over the legal rights of state employees. In Parente v. Southworth, 448 A.2d 769, 772 (R.I. 1982), for example, the Rhode Island Supreme Court permitted state employees to seek declaratory relief against the State Personnel Administrator, Bradford Southworth, to establish the "rights and the liabilities of the parties under the totality of the merit-system framework." Similarly, in Roch v. Garrahy,419 A.2d 827 (R.I. 1980), the Supreme Court again sanctioned the right of plaintiff Donald Roch, the Chairman of the Rhode Island Republican State Central Committee, to bring a declaratory action against the State to determine whether various executive branch employees had complied with the requirements for appointments to the State Board of Elections.
This authority, which succeeds the Rhode Island Supreme Court's decision in Nugent, clearly allows declaratory actions against the state to proceed without the bar of sovereign immunity, where a government employee seeks a declaration of his or her rights, status, and legal relations vis-a-vis the state. Were the sovereign immunity defense to prevail in such cases, such plaintiffs might well be denied a forum to clarify their rights as state employees. Accordingly, the State's sovereign immunity defense to plaintiffs' action for declaratory relief must fail. This Court thus will proceed to decision on the merits of plaintiffs' request for declaratory relief.
 Plaintiffs' Employment Status with the State
This Court is asked by the parties to this case to determine plaintiffs' employment status with the State. The State avers that these dentists and hygienists are not state employees, within the meaning of the Merit System Act, but are "contract employees" who perform dental services for the State. The State maintains that plaintiffs' services were legally contracted for by the Department of Corrections pursuant to the State Purchases Act, R.I. Gen. Laws § 37-2-1 et seq., which authorizes state agencies to procure the services of dentists and hygienists, without competitive bidding, where there is a need for such services and where no full-time employees of the State are available to perform the services.
Plaintiffs counter that they were never hired under the State Purchases Act. They argue that it was not until instituting their present complaint that the State claimed that plaintiffs were hired under the Act. Plaintiffs claim further that, as a matter of law, the State Purchases Act does not allow for their hiring. Arguing that they are full-time state employees under labor contracts with the State, plaintiffs maintain that the State is explicitly prohibited from hiring them under the State Purchases Act.
Plaintiffs assert that it is inconsistent for the State to now take the position that all of the plaintiffs are providing services to the State under the State Purchases Act when the State canceled its purchase orders for all independent contractors in 1991 (pursuant to the IRS audit) and categorized plaintiffs as "special contract employees." The plaintiffs argue that "by clear implication," through their continued full-time employment with the Department of Corrections, and by the absence of a specific exclusion placing them in the unclassified service, they are in the classified service under the Merit System Act.
The State responds that the expiration of the "special contract employee" designation did not expunge its authority to purchase the services of dentists and hygienists. The State maintains that it has had the power historically both before and after the advent of the "special contract employee" designation to purchase and contract for services required by the departments of state government. As there were no full-time state employees available to perform the necessary tasks requested of plaintiffs, and as all parties agreed to contract for such services outside of the Merit System Act, the State argues that it legally procured those services under the State Purchases Act.
 Interpreting the Applicable Law
The Merit System Act, R.I. Gen. Laws § 36-4-1 et seq., governs the hiring of persons into the state service. The state service is divided into the classified service and the unclassified service. R.I. Gen. Laws § 36-4-1. All persons are in the classified service unless they are specifically exempted and are thus in the unclassified service pursuant to R.I. Gen. Laws § 36-4-2. Prior to hiring someone into the state service, a department director must seek review from the State Budget Office to determine if there is available funding and obtain permission to hire from the Department of Administration and the Emergency Hiring Council. If such permission is granted, the position must be posted. Those candidates referred by the Division of Personnel then must be interviewed. Finally, the name of the selected individual must be submitted to the Division of Personnel for approval, subject to any applicable union contracts, the Merit System Act, and the Personnel Rules. Id. § 36-3-3 (1).
The scope of job duties of these state employees within the state service is determined by specifications developed by the Personnel Administrator under R.I. Gen. Laws §§ 36-4-9,36-4-10 and 36-4-11. In addition, the rate of remuneration for employees in the classified and unclassified service is uniform statewide for that classification and only may be established after a public hearing and approval by the Governor, pursuant to R.I. Gen. Laws § 36-4-13.
The Merit System Act, however, is not the only statutory mechanism by which a state department or agency can retain the personal services of an individual. The State Purchases Act, R.I. Gen. Laws § 37-2-1 et seq., historically has provided the State with the authority to "purchase and contract for . . . services required by any department or agency of the [S]tate government" and shall "apply to every expenditure of public funds by any state governmental entity . . . under any contract."[9]Id. § 37-2-4 (emphasis added).
These services consist of "the rendering by a contractor of its time and effort rather than the furnishing of an end product." R.I. Gen. Laws § 37-2-7 (20). A "contractor" is any person having a contract with a governmental body. Id. §37-2-7 (7). A "contract" includes an agreement for the purchase of services. Id. § 37-2-7 (5). Neither the contracts which are subject to the State Purchases Act nor the services purchased under the Act include "labor contracts with employees of state agencies." Id. §§ 37-2-7 (5), (20). An "employee" for purposes of the Act, is "an individual drawing a salary from a governmental body or public agency, whether elected or not, and any non-salaried individual performing personal services for any governmental body or public agency." Id. § 37-2-7 (10).
The State Purchases Act makes further explicit provisions for the procurement of professional services that cannot be provided easily within the framework of a civil service system. See, e.g.,
R.I. Gen. Laws § 37-2-69 (procurement of architectural, engineering, or consultant services); §§ 37-2-70 and 37-2-71
(procurement of legal services). Most relevant to this case is the statutory provision which pertains to the procurement of medical or dental services. Before a state department or agency procures the services of a physician or dentist, it shall demonstrate to the satisfaction of the chief purchasing officer the following:
 "(1) For medical or dental consultant services:
 (i) The need for the services required, including the scope of the services to be performed;
 (ii) That no medical or dental personnel employed by the state on a full-time basis is available to perform the services;
 (iii) That funding is available, indicating from which sources the funding is to be provided;
 (iv) That medical or dental consultants to be engaged meet the following minimum requirements:
 (A) Appropriate professional license or certification and;
 (B) Competence to perform the services as reflected by formal training and education, general experience, and experience in providing the required services.
 (2) For medical or dental services where those services are readily definitized and the required services are clearly defined:
 (i) The need for the services, including the detailed scope of work to be performed;
 (ii) That no full-time state employees are available to perform those services;
 (iii) That funding is available, indicating from which sources such funding is to be provided; and
 (iv) That such medical or dental service providers meet the following minimum requirements:
 (A) Possess appropriate professional Rhode Island licenses and certifications; and
 (B) Competence to perform such services as reflected by formal training and education, general experience, and expertise in providing the required services.
 (b) For medical or dental services, or for temporary services, generally definable over a definite period of time but on an as-needed basis to provide coverage for full-time state employees (doctors, dentists, nurses, etc.) during their absence. The procurements for those services shall be obtained through the use of a blanket-type contract arrangement. Requesting agencies shall provide to purchasing division fully authorized, funded and described requirement via a blanket-type purchase requisition.
 (c) Requesting agencies shall provide to the satisfaction of the chief purchasing officer or his or her designee the following:
 (1) Rationale that the services are required; and
 (2) Certification that medical or dental personnel to be employed possess the appropriate state license or certification, competence to perform those services as reflected by formal training, education, and experience in providing the required service.
 (d) Nothing in this law shall prohibit, nor shall anything in this law be interpreted to prohibit, appropriate action by the director or his or her designee to provide needed medical services whether on a regular or emergency basis."
Id. § 37-2-72 (emphasis added). "Procurement" is defined generally as "the purchasing . . . of any . . . services." Id. § 37-2-7 (15). It includes "all functions that pertain to the obtaining of any service, including a description of requirements, selection and solicitation of sources, preparation and award of contract and all phases of contract administration."Id.
In reading together these provisions of the Merit System Act and the State Purchases Act, it appears that generally state employees are hired under the Merit System Act and the Personnel Rules and Regulations which have been promulgated to effectuate that Act. In adopting the State Purchases Act, however, the Legislature has recognized that there are situations in which a state department or agency may need to hire someone by contract outside of the state service to render services to the department or agency.
This view is consistent with the broad powers that the Legislature has extended to department directors to administer their departments efficiently. See State Department ofCorrections v. R.I. Brotherhood of Correctional Affairs,725 A.2d 296, 298 (R.I. 1999). These powers extend to the hiring of state employees and the purchase of services. See, e.g., R.I. Gen. Laws § 42-56-10.
The Legislature has specifically granted these powers to the Director of the Department of Corrections by statute:
 "In addition to exercising the powers and performing the duties which are otherwise given him by law, the director of the department of corrections shall:
 (7) Hire, promote, transfer, assign, and retain employees and suspend, demote, discharge, or take other necessary disciplinary action;
 (19) Make and enter into any contracts and agreements necessary or incidental to the performance of the duties and execution of the powers of the department, including, but not limited to, contracts to render services to committed offenders, and to provide for training or education for correctional officers and staff;
 (22) Make and promulgate necessary rules and regulations incident to the exercise of his or her powers and the performance of his or her duties including but not limited to rules and regulations regarding nutrition, sanitation, safety, discipline, recreation, religious services, communication, and visiting privileges, classification, education, training, employment, care, and custody for all persons committed to correctional facilities."
R.I. Gen. Laws § 42-56-10 (emphasis added). Consistent with these powers, the Director of the Department of Corrections may initiate the hiring of state employees under the Merit System Act or he or she may enter into contracts sanctioned by the State Purchases Act that will enable the Department to render services to committed offenders. Id. § 42-56-10 (7), (19), (22); seealso State v. Arpin, C.A. P174-1477; P283-1969, (R.I. Super. Nov. 1991) (Goldberg, J.) (where the Court determined that R.I. Gen. Laws § 42-56-10 sets forth all statutory powers of the Director of the Department of Corrections and clearly envisions the Director entering into contracts to render services to offenders, including psychiatric services).
By providing in the State Purchases Act that neither the contracts nor the services purchased by a state department or agency can include "labor contracts with employees of State agencies," R.I. Gen. Laws §§ 37-2-7 (5), (20), the Legislature made it clear that the procurement process under that Act is not to be used as a mechanism to enter into a collective bargaining agreement with state employees or to enter into a labor contract with a state employee in the state service under the Merit System Act. Thus, the State Purchases Act cannot be used to circumvent the strictures of the Merit System Act and the Personnel Rules and Regulations adopted pursuant thereto in the hiring of someone into the state service.
With regard to the hiring of medical or dental personnel, the Legislature has imposed further restrictions: their services may not be procured by a state department or agency unless there is a need for those services, there is funding to pay for the services, and they are appropriately qualified to provide the services. R.I. Gen. Laws § 37-2-72 (2). Even if all of those criteria are met, such personnel still cannot be hired by contract if there are full-time state employees, within the state service, available to perform those services. Id. § 37-2-72
(2) (ii). The State may hire medical and dental personnel outside of the Merit System Act, therefore, only if there is a justifiable need to do so and there are no persons within the state service who can perform the requested service.
Thus while a state department or agency does not have unbridled authority to hire medical or dental personnel outside of the state service, it is granted flexibility in hiring such professionals when the need for their services cannot be met by existing state employees within the state service. This statutory scheme presumably grants the State the opportunity to attract persons to work for the State who have no interest in a civil service position, perhaps at a higher rate of pay, but with lesser benefits than that which would be afforded them as civil servants.
 Analysis of Plaintiffs' Employment Status Under the Applicable Law
Here, there is no question that at the time of plaintiffs' initial hiring, and at each interval thereafter when their annual contracts were renewed, there existed no full-time state employees, within the state service, who were available to perform the work plaintiffs agreed to perform by contract. The Department of Corrections was forced to look outside of the state service to plaintiffs precisely for this reason.
As George Vose, the Director of the Department of Corrections, explains in an affidavit dated July 16, 1999, there were two major reasons that obtaining necessary and appropriate dental services at the Department of Corrections was difficult: (1) the state salaries formally attached to the posted, classified Merit System dental positions did not attract candidates to fill the positions; and (2) the rising prison population and active federal involvement with prison conditions forced the Department to greatly expand dental services in an expedited manner. Faced with these difficulties, the State had to utilize methods outside of the Merit System Act and within the authority of the State Purchases Act to contract for the procurement of dental services to the inmate population.
It is disingenuous for the plaintiffs to argue that they were state employees of the Department of Corrections, within the state service, at the time that they entered into contracts with the Department. They were never hired as state employees under the Merit System Act. By contract, they agreed to a one year term of hire and compensation presumably well in excess of that which would have been paid to them within the state service. Their contracts made no provision for payment of benefits available to employees within the state service. They do not dispute that at the time of the expiration of each one of their contracts and the renewal of the next, there were no state employees, within the state service, available to perform the requested services. Each plaintiff could not have been such an employee because he or she was not hired into the state service under the Merit System Act and had no right at that time to continued state employment. Had there been such an employee, there would have been no need for a contract or contract renewal.
As such, the State Purchases Act authorizes the procurement of plaintiffs' services. There was a need for those services, and no person employed by the State on a full-time basis was available to perform those services.
The mere fact that plaintiffs have proceeded to work full-time for the State pursuant to a series of one year contracts and implicitly allowed the State, by contract, to assert certain controls over them in the workplace with regard to the payment of their compensation does not convert them into state employees within the Merit System. The Department of Corrections has the authority under the State Purchases Act to procure their services by contract outside of the Merit System, assuming the strictures of R.I. Gen. Laws § 37-2-72 are satisfied. Plaintiffs can refuse future employment on those terms, but they cannot force the State to maintain their current rate of compensation and provide them with those added benefits available to state employees in the classified service. Such a demand is tantamount to a request that this Court rewrite their contractual agreements.
For the reasons set forth in this Decision, plaintiffs' motion for summary judgment is denied and defendants' cross-motion for summary judgment is granted. This Court declares that plaintiffs are not classified employees within the Merit System Act, R.I. Gen. Laws §§ 36-3-1 et seq., and 36-4-1 et seq., and are not entitled either presently or retroactively to the benefits afforded such employees. Instead, the State has procured plaintiffs' services pursuant to a series of one year contracts authorized by the State Purchases Act, R.I. Gen. Laws §37-2-72. Plaintiffs are thus entitled only to the benefits for which they contracted.
Counsel should confer and submit to this Court forthwith for entry an agreed upon form of order and judgment which is reflective of this decision.
[1] The plaintiffs initially petitioned this Court for declaratory relief, and the defendants moved to dismiss pursuant to Rule 12 (b)(6). The parties subsequently agreed to resolve the instant matter through cross-motions for summary judgment with regard to the underlying declaratory judgment action.
[2] The Department of Corrections initially hired Dr. McCloskey on June 1, 1989 as an independent contractor. Dr. McCloskey maintains in her affidavit of July 15, 1999, that on January 15, 1992, she signed an employment agreement which made her a "special contract employee" for the term July 1, 1991 to June 30, 1992. Her last agreement covers the term from July 1, 1999 to June 30, 2000. Dr. McCloskey signed the aforementioned contract and the agreement for the prior term from July 1, 1998 to June 30, 1999, subject to her rights as determined in the instant litigation.
The Department of Corrections initially hired Dr. Frank as a special contract employee on November 1, 1991. Beginning in 1992, his employment also was governed by a series of one year agreements. His last agreement covered his final employment term from July 1, 1997 to June 18, 1998. Although he no longer seeks to be placed in classified service, he still requests compensation for benefits denied while he was an employee of the Department of Corrections.
The Department of Corrections initially hired Dr. Absi on March 1, 1994. His employment was also governed by a series of one year contracts. His last agreement covers the term from July 1, 1999 to June 30, 2000. Dr. Absi signed the aforementioned contract and the contract for the prior term of July 1, 1998 to June 30, 1999 subject to his rights as determined in the instant litigation.
The Department of Corrections initially hired Joseph Moreno as a dental hygienist on March 1, 1993. His employment was also governed by a series of one year contracts. His last agreement covers the term from July 1, 1999 to June 30, 2000. Joseph Moreno signed the aforementioned contract and the contract for the prior term of July 1, 1998 to June 30, 1999 subject to his rights as determined in the instant litigation.
The Department of Corrections initially employed Timothy Servant as a dental hygienist on July 1, 1993. His employment was also governed by a series of one year agreements with the Department of Corrections. His last agreement covers the term from July 1, 1999 to June 30, 2000. Timothy Servant signed the aforementioned contract and the contract for the prior term of July 1, 1998 to June 30, 1999 subject to his rights as determined in the instant litigation.
[3] See December 9, 1991, Inter-Office Memorandum from Lawrence C. Franklin, Jr., State Controller for the Department of Administration, Office of Accounts and Control addressed to all Chief Financial Officers of all State Departments and Agencies.
[4] See September 20, 1991, Inter-Office Memorandum from Jerome F. Williams, Deputy Director of the Department of Administration, addressed to all Chief Executive Officers of all State Departments and Agencies, regarding the "review of consultant contracts."
[5] Plaintiffs McCloskey and Frank were the only plaintiffs to this action officially designated as "special contract employees". No party to this case contends that these plaintiffs are still classified as such "special contract employees". This Court has included background on this classification in fairness to the plaintiffs' argument, despite finding minimal moment to such designation.
[6] According to the Affidavit of Anthony Bucci, Personnel Administrator for the Rhode Island Department of Administration, prior to the abolishment of the "dentist" classification in the state service, the statutory pay plan ordered compensation for that job classification at pay grade 34. In 1999, at the maximum step of pay grade 34, a person employed as a dentist within the classified service, assuming that classification still existed, would have been paid gross wages totaling $51,164.00, at an hourly rate of approximately $28.00 per hour.
[7] According to the Affidavit of Anthony Bucci, a classification entitled "dental hygienists" exists within the state classified service system. Under the statutory pay plan, the pay grade for that classification is set at level 15. In 1999, an employee paid at a pay grade of 15, at the maximum step, would receive gross wages totaling $25,863.00, at an hourly rate of $12.43.
[8] Plaintiffs implicitly have accepted all of these controls and conditions placed on their employment by the State as part of their contractual agreements with the State. To the extent those contracts are authorized, therefore, those controls and conditions are authorized as well.
[9] This statutory language in the State Purchases Act dates back for at least fifty years. See 1939 P.L. Ch. 660, § 66.